*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DAMITRICE DESHAWN VANN,

Defendant-Appellant.

UNPUBLISHED
February 25, 2020

No. 338742
Oakland Circuit Court
LC No. 2010-234339-FC

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

DAMITRICE DESHAWN VANN,

Defendant-Appellee.

No. 344432
Oakland Circuit Court
LC No. 2010-234339-FC

ON REMAND

Before: TUKEL, P.J., and K.F. KELLY and M.J. KELLY, JJ.

PER CURIAM.

This case returns to this Court by order of our Supreme Court to consider this case "on the merits." *People v Vann*, ___ Mich ___; 936 NW2d 305, 306 (2019). In 2011, a jury convicted defendant of armed robbery, MCL 750.529; carjacking, MCL 750.529a; larceny of a firearm, MCL 750.357b; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. In March 2011, the trial court sentenced defendant to 22 years and 9 months to 60 years' imprisonment for armed robbery and carjacking, 4 to 20 years' imprisonment for larceny of a firearm, and a consecutive 2 years' imprisonment for felony-firearm. Based on our review of the merits of defendant's and the prosecution's appeals, we affirm the trial court's order granting

-1-

defendant a new trial on the grounds of ineffective assistance of counsel. Accordingly, we vacate defendant's convictions and sentences, and we remand the case for a new trial.

## I. FACTS

## A. UNDERLYING FACTS

This Court previously summarized the underlying facts of this case in *People v Vann*, unpublished per curiam opinion of the Court of Appeals, issued June 19, 2012 (Docket No. 304041) [*Vann I*], p 1-2:

> At about 2:30 a.m. on September 12, 2010, Tracey Mills parked at North Park Towers Apartments where she lived. Mills did not see anyone outside and was startled when she noticed two men at the well-lit entrance of the apartment building. She identified one man as defendant Vann and the other as his codefendant, Alex Jerome Perry, Jr. When Mills swiped her fob to gain access to the building, Vann knocked her hand down and pointed a gun to her forehead. Mills tried to run away, but was wearing high heels and fell. When she fell, Mills' purse, keys, and .380 semi-automatic handgun, for which she had a concealed weapons permit, fell out onto the ground. Mills testified that Vann took her keys and that Perry took her purse and gun. The two men ran to Mills' car, Vann got in the driver's seat, and the men left quickly. Mills called the police as soon as her attackers fled. Mills provided police with detailed descriptions of her attackers.

> Mills testified that during the evening of September 12, 2010, she saw Vann in the food court area of the Motor City Casino, where she worked, and immediately identified him as one of her attackers. Samantha Gibbs testified that she was with Vann and Perry at the Motor City Casino in the early morning hours of September 11, 2010. And Gibbs and Perry testified that Vann was ejected from the casino after Vann and Mills had a verbal altercation. However, Mills denied that an altercation occurred or that she ever saw Vann or Perry before September 12, 2010.

> Mills further testified that on September 19, 2010, at about 1:00 a.m., she saw Perry place a food order at a computer kiosk, go to the counter [sic] speak with Mills' supervisor, and then "rush" out of the food court without his food. Someone else returned to pick up the order. Mills kept Perry's receipt, which had his name on it, and provided it to Southfield Police Detective Mark Ryder.

> Mills later identified Perry in a photographic array. When interviewed, Perry gave Vann's name to Detective Ryder. Mills identified Vann in a different photographic lineup. In an interview with Detective Ryder, Vann stated he was not sure where the North Park Towers Apartments were and denied involvement in the crimes. Also, at trial, Vann's mother and a family friend testified that Vann was at his mother's house at the time of the crimes.

> On September 21, 2010, Mills wrote a statement about Perry coming to the casino on September 19, 2010. On cross-examination, Perry's defense counsel

questioned Mills about her written statement: particularly, that Mills saw Perry "rush" out of the food area. When asked what she meant by "rushed," Mills answered, "I don't know if I can say what my supervisor told me, but that's the information I got from my supervisor." Mills went on to testify that her description of Perry rushing was made on the basis of both what she saw and what her supervisor told her. Perry's defense counsel questioned Mills, asking, "So now it's what you saw and what you were informed of?" On redirect examination, the prosecution moved to have the September 21, 2010 written statement admitted as a prior consistent statement to rebut the inference that Mills' trial testimony was a recent fabrication. The trial court admitted the statement over Perry's objections.

Also relevant to this appeal, during Vann's interview, Detective Ryder asked if Vann had a gun and then stated, "According to Alex [Perry] you carried it [a gun] a lot." Before trial, the trial court struck this statement. At trial, Perry denied that Vann carried a gun. In response, the prosecutor referred Perry to a statement he made to Detective Ryder, in which he stated, "I've known him [Vann] for carrying a gun." Perry continued to testify that he never said Vann carried a gun. Vann moved for a mistrial on the basis of Perry's testimony. The trial court denied the motion.

In October 2010, about five weeks after the robbery, Mills's gun was found in a drug house in the possession of Nathan Steciak. Steciak is 6'2" and had short hair in a "wave" and "a little bit of fuzz on his chin" when he was arrested. Steciak was not charged in connection with this case and defendant's trial attorney, Todd Kaluzny, did not notice information about the recovery of Mills's gun in the discovery materials sent to him before trial began. Consequently, Kaluzny did not use this information as part of his defense strategy at trial.

## B. PROCEDURAL HISTORY

The procedural history of this case is long and twisted. We will simplify the procedural history as much as possible, but ultimately it boils down to this: the trial court, in considering a motion for new trial, found that defendant received ineffective assistance of trial counsel. The prosecutor has appealed that order, but we agree that defendant's trial counsel, Todd Kaluzny, was ineffective and that defendant was prejudiced. We therefore affirm the grant of a new trial to defendant, and need not consider any other issue on appeal; our disposition of the ineffective assistance issue affords defendant the full measure of relief, a new trial, which an appeal on the merits could grant. We therefore do not consider any other issue in this appeal.

Following trial, defendant appealed his conviction as of right, claiming several trial errors which we need not detail here. This Court affirmed defendant's convictions in *Vann I*, unpub op at 1, 7.

Following this Court's ruling in *Vann I*, defendant filed a motion pursuant to MCR 6.428; the motion asked the trial court to reissue the judgment of sentence so that defendant could pursue a claim that he had received ineffective assistance of appellate counsel in his direct appeal leading up to *Vann I*. On direct appeal in *Vann I*, defendant had been represented for a time by attorney Robert Slameka. The Attorney Discipline Board had found that Slameka engaged in professional

misconduct, and a suspension from the practice of law went into effect during the course of the appeal. In that appeal, a brief was filed in the name of a different attorney, but that brief apparently was written by Slameka, as the attorney whose name appeared on the brief represented that he had not written it. Both parties stipulated to the trial court reissuing the judgment of sentence so that defendant could directly appeal. Our Supreme Court summarized defendant's situation with regard to Slameka:

> Although the defendant purportedly received an appeal of right, the substitution of counsel filed in the Court of Appeals on November 23, 2011 resulted in both attorneys disclaiming responsibility for representing the defendant. The defendant was left without counsel of record for the remainder of the appeal, from a point before the filing of the brief on appeal. Accordingly, as both parties concede, the defendant was deprived of his right to a direct appeal with counsel. The remedy for this constitutional error is the reinstatement of the appeal. [*Vann*, ___ Mich ___; 936 NW2d 305-306.]

Thus, the Supreme Court effectively vacated this Court's opinion in *Vann I*, as the Supreme Court found that defendant had been denied his right to counsel in this Court, even though the Supreme Court's order only expressly addressed our more recent opinion in *People v Vann*, unpublished per curiam opinion of the Court of Appeals, issued April 23, 2019 (Docket No. 338742) [*Vann II*], vacated ___ Mich ___; 936 NW2d 305, 306 (2019).[1] *Vann*, ___ Mich ___; 936 NW2d 305-306.

While the litigation regarding defendant's appellate representation was proceeding, defendant pursued a parallel track: following the trial court's reissuance of the judgment of sentence, he filed an appeal and a motion to remand for an evidentiary hearing, claiming that he had received ineffective assistance of trial counsel. The trial court granted the motion and conducted an evidentiary hearing, at which several witnesses testified, including defendant's trial attorney. Following the hearing, the trial court found that defendant had received ineffective assistance of counsel, and ordered a new trial. The prosecutor separately appealed that order, and the case was consolidated with defendant's appeal in *Vann II*, in which we held that MCR 6.428 did not provide a basis for the trial court's exercise of jurisdiction. We thus vacated, without prejudice, the finding of ineffective assistance of counsel and dismissed that appeal. As our ruling in that regard also was part of *Vann II*, it too was vacated by the Supreme Court's remand order. *Vann*, 936 NW2d at 305-306. The remand order further directed us to consider "the parties' appeals on the merits," which necessarily includes the prosecutor's appeal of the finding of

---

[1] In addition to the suspension which took effect during Vann's direct appeal, Slameka later was disbarred for his conduct in representing Vann; the Attorney Discipline Board made findings of numerous false statements by Slameka, among other acts of misconduct. However, the Attorney Discipline Board apparently did not reach the issue of whether Slameka had forged the other attorney's signature. See http://www.adbmich.org/coveo/notices/2018-05-17-17n-07.pdf#search=%2220567%20slameka%20robert (last visited February 9, 2020).

ineffective assistance of counsel. *Id*. Thus, the prosecutor's appeal of the trial court's finding of ineffective assistance of counsel is properly before us.[2]

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. STANDARD OF REVIEW

"Whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). "A finding is clearly erroneous if it leaves this Court with a definite and firm conviction that the trial court made a mistake." *People v Dillon*, 296 Mich App 506, 508; 822 NW2d 611 (2012).

### B. ANALYSIS

A "defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel. . . ." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

> Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. To establish an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. [*People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012) (citations omitted).]

The "reasonable probability" standard can be satisfied by less than a preponderance of the evidence. *Trakhtenberg*, 493 Mich at 56.

The "reviewing court must not evaluate counsel's decisions with the benefit of hindsight," but should "ensure that counsel's actions provided the defendant with the modicum of representation" constitutionally required. *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004), citing *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). Thus, there is a "strong presumption that trial counsel's performance was strategic," and "[w]e will not substitute our judgment for that of counsel on matters of trial strategy[.]" *Id*. at 242-243.

---

[2] Given the remand from the Supreme Court, we ordinarily would give the parties the opportunity to file new briefs, as all of the briefs were filed before we issued our opinion in *Vann II* and before the Supreme Court's order vacating *Vann II*. However, we find that the parties' briefing in the prosecutor's appeal of the finding of ineffective assistance of counsel fully presented that issue; and as we find that issue dispositive, we see no need for additional briefing.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. [*Strickland*, 466 US at 689 (citation omitted).]

"Yet a court cannot insulate the review of counsel's performance by calling it trial strategy." *Trakhtenberg*, 493 Mich at 52. "The inquiry into whether counsel's performance was reasonable is an objective one and requires the reviewing court to determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012) (quotation marks and citation omitted). Accordingly, the reviewing court must consider the range of potential reasons that counsel might have had for acting as he or she did. *Id*.

Furthermore, with regard to prejudice, as noted, to obtain a new trial on ineffective assistance grounds, a defendant must show that "there is a reasonable probability that, but for counsel's errors, a different outcome would have resulted." *Jackson*, 292 Mich App at 600-601. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (quotation marks and citation omitted). To meet this standard, a defendant does not have to show that the evidence would have ensured acquittal, *id*. at 397, nor is a defendant even required to show that counsel's failure more likely than not altered the outcome, *Harrington v Richter*, 562 US 86, 112; 131 S Ct 770; 178 L Ed 2d 624 (2011). Nevertheless, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id*. "[W]here there is relatively little evidence to support a guilty verdict to begin with (e.g., the uncorroborated testimony of a single witness), the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt." *Trakhtenberg*, 493 Mich at 56.

## C. DEFICIENT PERFORMANCE BY TRIAL COUNSEL

In this case, following the evidentiary hearing, the trial court granted defendant a new trial on ineffective assistance grounds. The trial court resolved the first prong—the reasonableness of defense counsel's performance—by noting that Kaluzny admitted "that it wasn't a strategic decision" to not pursue information about the circumstances of the recovery of the gun; the gun was seized in a drug house, in the possession of a third-party, some time after the armed robbery for which defendant was convicted. The trial court also found that defendant was prejudiced by Kaluzny's deficient performance because there was a reasonable probability that the result of trial would have been different if Kaluzny had introduced evidence that Steciak was found with Mills's gun and met at least part of her description of the gunman who robbed her. We agree.

The trial court did not err by concluding that defense counsel's performance fell below an objective standard of reasonableness. Although the prosecutor provided defense counsel with discovery information stating that Mills's stolen gun had been recovered by the Detroit Police Department, defense counsel made no attempt to investigate the facts surrounding the gun's

recovery, which would have led to the information that the gun was recovered in Steciak's possession. Significantly, at the evidentiary hearing, Kaluzny acknowledged that the failure to investigate this matter was not a strategic choice. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 US at 690-691. Instead, according to Kaluzny's testimony, he either missed the entry in the discovery packet about recovery of the gun or, if he saw it, he failed to follow up due to an oversight. Had Kaluzny been aware of the gun's recovery, he believed that as a thorough attorney he would have followed up to obtain information regarding the gun's seizure. In short, Kaluzny's failure to pursue information about the recovery of the gun arose from error on his part; it was not a strategic decision made on the basis of any investigation or analysis at all. Accordingly, defense counsel's performance fell below the professional norm. See *id*.

## D. PREJUDICE

The record makes clear that defendant was prejudiced by Kaluzny's deficient performance. The prosecution's case hinged on Mills's identification of defendant and Perry as her assailants. There was no physical evidence linking defendant and Perry to the crime and defendant and Perry were not found with Mills's stolen property. In fact, Steciak was the only individual found with any of Mills's stolen property—her gun. Furthermore, there no were videos or surveillance photographs of the robbery and Mills was the only witness to the robbery. Consequently, there was no other corroboration for Mills's testimony. While there were inconsistencies in defendant's statements to police and Perry admitted that he and defendant had gone to an apartment building in Southfield in September 2010, this is not proof of armed robbery.[3] Additionally, both men denied committing the robbery. Defendant also presented an alibi defense; and, although Mills denied ever seeing defendant and Perry before the robbery, the defense argued and presented evidence that Mills may have recognized them from an altercation at the casino in September 2010.

In this context, the reliability of Mills's identification was a pivotal issue at trial; but there was no corroboration for her identification, and there were inconsistencies in her statements. The discrepancies in her various descriptions of the assailants included, for example, different accounts of the heights of her assailants relative to each other, whether they both had dark or light complexions, and whether they were wearing hats.[4] The robbery took place relatively quickly, meaning that Mills's opportunity to observe the robbers was relatively brief; and Mills failed to notice certain distinguishing features, such as tattoos on defendant's face and tattoos on Perry's hands. Mills also hesitated when selecting defendant from the photograph array. It should be noted, however, that Mills described the gunman as having long braided hair. This description is consistent with Mills's description, but may not have been consistent with Steciak's; as noted

---

[3] Perry's statement to police about Vann going with him to an apartment in Southfield also was inadmissible hearsay as against Vann. See MRE 801(d); *Crawford v Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004).

[4] Mills needed to have her memory refreshed at trial to remember that Perry wore a baseball hat during the robbery.

earlier, Steciak had short hair with a "wave" and "a little bit of fuzz on his chin" when he was arrested in October 2010, but his hair style at the time of the robbery in September 2010 is unknown.

Given that the prosecution's case rested on the uncorroborated testimony of a single witness, the inconsistencies in Mills's descriptions of the robbers are particularly important. In terms of height of her assailants, Mills testified that, while wearing heels, she was "face-to-face" with the gunman, presumably defendant; Mills is 5'7" and was wearing 3½ or 4 inch heels on the night of the robbery, making her 5'10" or 5'11." Defendant is 5'8" or 5'9" without shoes and, therefore, would have been about eye level with Mills when wearing shoes. But Mills also testified that the gunman was the taller of her two assailants. Perry is taller than defendant, but Steciak, who is 6'2", is taller than Perry. However, immediately after the robbery, Mills also provided two additional points about the gunman. First, Mills indicated with her hands how tall the gunman was. The police officer who observed this estimated that based on the placement of Mills's hands the gunman was 6'2." This 6'2" height, however, is not consistent with the 5'10" height Mills verbalized to the 911 operator shortly after the robbery. When taken together, Mills gave four separate statements of the height of the man who pointed the gun at her. Defendant fits only two of these descriptions and Steciak fits the other two descriptions.

Additionally, Mills failed to notice any teardrop tattoos on the gunman's face. Steciak does not have any face tattoos, but defendant had teardrop tattoos on his face. While a police officer who interviewed defendant testified that the teardrop tattoos on defendant's face are easy to miss, it is quite obvious that a witness also would not notice tattoos on a person, such as Steciak, who does not have them. Furthermore, Mills testified at trial that while both of her assailants were African American males, the gunman had a lighter complexion than the second individual, Perry. The police officer who arrested Steciak described him as a black male with a "light complexion" and Mills described defendant as having a "caramel complexion" and that any statement she made about an assailant with a "dark brown complexion" would have been only in reference to Perry. Steciak and defendant both have lighter skin tones than Perry. Consequently, Mills's description of the gunman having a lighter complexion than Perry could apply to either defendant or Steciak.

Finally, and perhaps most importantly, Steciak, not defendant or Perry, was found with Mills's gun. A police officer testified at the evidentiary hearing that it is not uncommon for a gun at a drug house, such as where Steciak was found in possession of Mills's gun, to change hands multiple times and to be used more to defend the drug house than as any one individual's weapon. Consequently, the fact that Steciak was found with the gun may not be particularly probative of whether he stole it from Mills. On the other hand, the gun itself is the only piece of objective, physical evidence of the crime, and given that Steciak was the individual found with it, the jury may have considered this particularly persuasive evidence if it had been presented at trial.

Although Steciak did not confess to the robbery, information about the seizure of the gun and the presentation of photographs of Steciak from 2010 would have enabled the jury to compare Steciak's appearance to Mills's descriptions. While there are certainly differences in the appearances of Steciak and defendant, for example the previously noted differences in hair styles, Steciak fit other aspects of Mills's description of the gunman and was found with her gun. Consequently, there is a reasonable probability that the availability of an alternative suspect, who according to witness descriptions matched aspects of Mills's various descriptions of the gunman,

could have created reasonable doubt about defendant's guilt; this is particularly so given that there was no physical evidence linking defendant to the crime, Mills was the only witness, and Steciak was found in possession of the gun. In other words, Steciak's existence as a viable suspect, when considered in light of the inconsistencies in Mills various statements, would have further undermined the reliability of Mills's identification of defendant. The notion of Steciak as an alternative suspect also would have been wholly consistent with defendant's claimed alibi defense and his assertion that Mills recognized him from an altercation at the casino shortly before the robbery.

As noted by the prosecutor, Steciak's possession of the gun does not conclusively establish that he stole the weapon.[5] But defendant was not required to prove Steciak's guilt beyond a reasonable doubt or to show that presentation of this evidence would have ensured his acquittal. See *Ackley*, 497 Mich at 397. The fact remains that Steciak—like defendant—matches portions of Mills's varying descriptions of the gunman, and Steciak—unlike defendant—was found in possession of her stolen gun, making it reasonably probable that the jury would have reached a different conclusion about the reliability of Mills's identification had it heard that evidence. In these circumstances, where the prosecution's case hinged wholly on Mills's testimony, the trial court did not clearly err by concluding that Kaluzny's failure to investigate and present evidence about Steciak undermined the reliability of the verdict. See *id.*; *People v Douglas*, 496 Mich 557, 586; 852 NW2d 587 (2014). Accordingly, defendant met his burden of establishing ineffective assistance of counsel.

In contrast to this conclusion, the prosecutor makes two additional arguments. First, the prosecutor argues that the trial court failed to apply the correct standards for determining prejudice in the ineffective assistance context. The trial court, however, correctly identified the prejudice standard, concluding that there was a "substantial likelihood or reasonable probability of a different result" in this case. See *Ackley*, 497 Mich at 397. The trial court in fact had the chance to review the photographs of Steciak and to consider witness descriptions of Steciak, and then made its finding that there was a substantial likelihood or reasonable probability of a different result in the case if the evidence relating to Steciak had been presented. The prosecutor has not shown error in this regard.

Second, the prosecutor's assertion that the trial court's findings were erroneous because the trial court forgot about key evidence is meritless. The trial court asked the parties if the incident recall list was provided to Kaluzny before trial. The prosecutor did, in fact, provide the incident recall list to Kaluzny before trial and the trial court found that no *Brady* violation occurred.[6] Consequently, the trial court effectively resolved the prosecutor's concerns about whether the incident recall list was provided by the prosecutor to defense counsel and, therefore, the prosecutor

---

[5] The unexplained possession of stolen property can, however, support the conclusion that the possessor committed larceny. See *People v Hutton*, 50 Mich App 351, 357; 213 NW2d 320 (1973). "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority." *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012) (citation omitted).

[6] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

has not shown error on this basis. More generally, while the trial court asked on the second day of the hearing whether the arresting officer had testified, the prosecutor has not explained how this invalidates the trial court's findings. Although the prosecutor characterizes the police officer's testimony as compelling, he did not actually know where or how Steciak obtained the gun, and his testimony certainly does not render the trial court's findings clearly erroneous. Notwithstanding the trial court's need to be reminded that the police officer testified, the trial court understood the salient issues and determined that defendant was deprived of the effective assistance of counsel. The prosecutor has not shown error.

## III. CONCLUSION

Because defendant's trial counsel was ineffective, we affirm the trial court's order granting defendant's motion for a new trial. Consequently, the issues raised by defendant in Docket No. 338742 are moot.

Defendant's convictions are vacated and we remand for a new trial. We do not retain jurisdiction.

/s/ Jonathan Tukel
/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly

-10-